UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Howard Porter,

                          Petitioner,          CV-09-2142 (CPS)

    - against -                                MEMORANDUM
                                               OPINION AND ORDER
United States of America,

                          Respondent.

----------------------------------------X
SIFTON, Senior Judge.

        Petitioner Howard Porter was convicted in 2003 before

the undersigned of seven counts of possession of child

pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B),[1]

2252A(b)(2),[2] and three counts of transporting and shipping child

pornography by computer in interstate commerce in violation of 18

U.S.C. §§ 2252A(a)(1),[3] 2252A(b)(1).[4]  After a jury trial, he was

------------------------

    [1]  18 U.S.C. § 2252A(a)(5)(B) criminalizes:

    knowingly possess[ing], or knowingly access[ing] with intent to view,
    any book, magazine, periodical, film, videotape, computer disk, or any
    other material that contains an image of child pornography that has been
    mailed, or shipped or transported using any means or facility of
    interstate or foreign commerce or in or affecting interstate or foreign
    commerce by any means, including by computer, or that was produced using
    materials that have been mailed, or shipped or transported in or
    affecting interstate or foreign commerce by any means, including by
    computer.

    [2]  18 U.S.C. § 2252A(b)(2) specifies the penalties for violation of 18
    U.S.C. § 2252A(a)(5).

    [3]  18 U.S.C. § 2252A(a)(1)criminalizes "knowingly mail[ing], or
    transport[ing] or ship[ping] using any means or facility of interstate or
    foreign commerce or in or affecting interstate or foreign commerce by any
    means, including by computer, any child pornography."

    [4]   18 U.S.C. § 2252A(b)(1) specifies the penalties for a violation of
    2252A(b)(1).

sentenced to 48 months in custody, to be followed by 3 years of supervised release.  Petitioner began serving his supervised release on August 31, 2007.  On November 13, 2007 I found that petitioner had violated a condition of his supervised release[5] and imposed a sentence of four months in custody, to be followed by 32 months of additional supervised release.  One of the special conditions I imposed as part of the terms of the supervised release required that the defendant participate in a mental health treatment program tailored to sex offenders, as identified by the Probation Department.  Petitioner finished serving his additional four month sentence on February 26, 2008, and began serving his second period of supervised release.  On March 3, 2008 he began attending a sex offender treatment program at the New York Forensic Center for Neuropsychology and Forensic Behavioral Science.  Because of his poor participation, on August 19, 2008 he was discharged from the program.  Following a hearing, I found that defendant had violated the terms of his supervised release by failing to participate meaningfully in sex offender mental health treatment, and on January 29, 2009, I imposed a sentence of nine months incarceration, without any term of supervised release to follow.

Petitioner now moves to vacate his conviction pursuant

---

[5] I found that Defendant had failed to abide by the rules of the Residential Reentry Center where he was ordered to live as part of the terms of his supervised release.

to 28 U.S.C. § 2255, raising the following claims: (1) that the court's refusal to appoint trial-level counsel violated petitioner's right to counsel under the Due Process Clause of the Fourteenth Amendment and 18 U.S.C. § 3006A(a)(1)(E); and (2) that counsel who represented him at the violation hearing was in fact ineffective. Petitioner has also appealed his sentence to the Second Circuit and requests, if his habeas petition is denied, that this court stay his sentence pending appeal. For the reasons set forth below, petitioner's § 2255 application and his request for a stay are denied.

## BACKGROUND

Familiarity with the factual background of this matter is presumed based on the record of proceedings before the undersigned. For a more complete description of the facts of this case, *see U.S. v. Porter*, No. 03-CR-0129 (CPS), 2007 WL 3541525 (E.D.N.Y. Nov. 14, 2007) and *U.S. v. Porter*, No. 03-CR-0129 (CPS), 2008 WL 5377946, (E.D.N.Y. Dec. 23, 2008).

Between October 7, 2002 and December 2002, an undercover detective from the Wichita, Kansas Police Department, posing as the mother of a four-year-old daughter in Wichita, entered a chat room believed to be frequented by individuals interested in exchanging child pornography or engaging in sexual activities with children. Mr. Porter initiated contact with the

detective, and several chat sessions ensued in which Mr. Porter discussed the possibility of engaging in sexual activity with the four-year-old daughter. Mr. Porter also sent the detective e-mail messages with attached images of child pornography. Law enforcement officers obtained a warrant to arrest Mr. Porter and search his home, which was executed on January 9, 2003. Among the evidence seized in the home were computer materials containing images of child pornography and ten photographs of children, including Mr. Porter's minor son.

Mr. Porter was arraigned on January 9, 2003, and signed an unsecured bond in the amount of $150,000 in which he agreed to conditions of pretrial release set by Magistrate Judge Azrack. These conditions included restriction of travel to New Jersey and New York City, surrender of his passport, weekly in-person reports to and random visits by the Pretrial Services Agency, evaluation and treatment for mental health problems, forbearance from unsupervised contact with children, and a ban on Internet use. On January 28, 2003, Magistrate Judge Mann imposed additional conditions of drug and alcohol testing and treatment as well as cessation of employment or volunteer work with the National Coalition for Civil Rights.

On January 30, 2003, Mr. Porter was indicted on three counts of transporting child pornography in interstate commerce. The indictment was superseded by a fourteen-count indictment on

April 23, 2003, charging Mr. Porter with three counts of
transporting and shipping child pornography by computer in
interstate commerce in violation of 18 U.S.C. §§ 2252A(a)(1),
2252A(b)(1), and 3551 et seq., and eleven counts of possession of
child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B),
2252A(b)(2), and 3551 et seq.

In accordance with the conditions of his pretrial
release, Mr. Porter was evaluated at the New York Center for
Neuropsychology and Forensic Behavioral Science. The evaluation
concluded that

> defendant's primary sexual interest is in
> adolescent females . . . he endorsed items which
> reflect justification for pedophilic behavior, the
> types of rationalization and/or excuses used frequently
> by individuals who are sexually involved with
> children . . . he attempts to present himself in a
> socially desirable light . . . Mr. Porter is either
> unwilling to openly discuss his offending behavior,
> and/or, lacks substantial insight into the nature of
> the same.

Mem. From Melissa A. Roman, United States Pretrial Services
Officer, Apr. 3, 2003, at 1-2 (internal quotation marks omitted).

The treating facility also determined that Mr. Porter
was "in need of individual therapy to: monitor his mental status
over time; and, to confront his distorted thinking, and gain
insight into his offending behavior." *Id.* at 1. Mr. Porter
refused to participate in treatment. While on pretrial release,
Mr. Porter also failed to attend a pretrial services appointment,
report a change in employment, and be present for a scheduled

home visit.

On July 9, 2003, Mr. Porter and his former wife, Annette, were divorced in Staten Island Supreme Court. They had been wed on November 20, 1999, and their marriage produced one child, Andrew.

A jury trial of Mr. Porter commenced on October 7, 2003, and on the government's motion, one count of possession of child pornography was dismissed. On October 16, 2003, the jury acquitted Mr. Porter on three counts of possession, found Mr. Porter guilty on the remaining seven counts of possession, and found Mr. Porter guilty on all three counts of transportation. Mr. Porter remained on conditional release following the verdict and pending sentencing.

At the time of Mr. Porter's sentencing, Mr. Porter's criminal history included a conviction in 1987 for battery of a Florida law enforcement officer and disorderly conduct resulting in a sentence of three years of probation; a conviction in 1993 for disorderly conduct in Putnam Valley, New York, in connection with an arrest for criminal contempt; and driving while intoxicated, which occurred pending sentencing on the jury's verdict.

Also in 2003, Mr. Porter's son was removed from his custody by the Administration for Children's Services on neglect charges, with custody eventually transferred to his son's great-

aunt.

In December 2003, a permanent injunction was issued by the Volusia County Court of Florida barring Mr. Porter from contacting his former wife and their child, Andrew.

On March 10, 2004, the government moved for Mr. Porter's remand, which the Court granted based on Mr. Porter's violation of the following conditions of his release: Mr. Porter (1) was twice seen by Administration for Children's Services workers at a public library, each time on internet chatrooms; and (2) failed to report a driving while intoxicated arrest as required.

Following his sentencing on May 15, 2004, Mr. Porter moved for bail pending appeal. I denied the motion, finding Mr. Porter to be a danger to the community. On July 20, 2005, Mr. Porter again moved for release pending appeal, claiming that he had demonstrated a substantial likelihood of reversal on the seven possession counts, which would reduce his sentence, and that he was not a danger to the community or a flight risk. The motion was denied on September 15, 2005.

Mr. Porter appealed his conviction and sentence to the Second Circuit. On June 5, 2006, the Second Circuit affirmed the conviction but remanded to the undersigned for re-sentencing, under *United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). *U.S. v. Porter*, 184 Fed. Appx. 112, 115 (2d Cir. 2005). In June 2006,

Mr. Porter moved for release pending re-sentencing which the court denied in October 2006. On November 1, 2006, Mr. Porter was resentenced to 4 years imprisonment and 3 years supervised release. Mr. Porter appealed the November 1, 2006 sentence to the Second Circuit, and that court affirmed the sentence on July 20, 2007. *U.S. v. Porter*, 2007 WL 2090147 (2d Cir. 2007).

On February 22, 2007, Mr. Porter filed a new motion for bail pending appeal. On April 5, 2007, Mr. Porter's motion was denied, because (1) Mr. Porter had not demonstrated a likelihood of success on appeal or a substantial issue of law or fact likely to result in a reduced sentence to less than the time he would have served when the appeals process was likely to be completed; and (2) Mr. Porter had not demonstrated that the danger which he presented to the community would be significantly reduced or eliminated in the time left on his sentence by medical or correctional treatment outside the prison system.

Mr. Porter thereafter filed a Writ of Certiorari to the United States Supreme Court, which was denied on April 30, 2007. *Porter v. U.S.*, 127 S.Ct. 2149 (2007).

On July 30, 2007 Mr. Porter filed a *pro se* motion to vacate judgment pursuant to Federal Rule of Civil Procedure 60(b)(6) based on the court's rulings with respect to discovery issues before his October 2003 trial. I denied this motion in a Memorandum and Opinion dated November 13, 2007.

On August 16, 2007, Mr. Porter filed a *pro se* motion for injunctive and declaratory relief from the requirements of the Sex Offender Registration and Notification Act ("SORNA") and modification of supervised release. Specifically, Mr. Porter sought (1) to enjoin his registration under SORNA claiming that the statute violated the ex post facto clause of the Constitution; (2) access to Richmond and Kings County because of pending legal actions, as well as the state of New Jersey where his son resides; and (3) suspension of mandatory drug testing. I denied this application on January 2, 2008.

On August 31, 2007, Mr. Porter was released from prison and began his three-year sentence of supervised release. The following special conditions of supervised release were imposed in addition to the Eastern District's standard conditions of release:[6] Mr. Porter was required to (1) follow the directions of the Probation Department with respect to psychiatric and substance abuse treatment; (2) not use any computer or Internet connection for the purpose of gaining access to child pornography; and (3) submit to monitoring, directly or electronically, of any personal computer, in order to assure compliance with condition (2).

---

[6] The standard conditions of supervised release include: (1) restrictions on travel; (2) mandatory reports to the probation officer; (3) compliance with probation officer instructions; (4) support to dependents; (5) regular work at a lawful occupation; (6) informing the probation officer of changes in residence or employment; and (7) alcohol and drug restrictions.

On September 7, 2007, following Mr. Porter's unsuccessful search for a primary residence, the Probation Department moved for a modification of the conditions of Mr. Porter's supervised release as follows:

> For a period of 180 days, the defendant shall reside in a Residential Re-Entry Center (RRC) approved by the Probation Department.  While in the RRC, the defendant shall adhere to all rules and conditions established by the RRC, including the payments of subsistence costs.  If the defendant establishes a stable residence that is approved by the Probation Department during this 180 day period, the defendant is to be released from the RRC and this condition shall be considered satisfied.

The above modification was ordered by the undersigned on September 17, 2007, after Mr. Porter submitted a written waiver of his right to a hearing.

On September 28, 2007, the Probation Department requested a modification of the conditions of supervision to require that Mr. Porter participate in a mental health treatment program, contribute to the cost of such services or any psychotropic medications prescribed, and undergo a polygraph examination as part of the treatment, all of which Mr. Porter opposed.  The Probation Department also moved for a modification of the conditions of Mr. Porter's supervised release to include computer and Internet monitoring and the requirement of random searches, which was ordered by the undersigned on October 1, 2007, after Mr. Porter's waiver of his right to a hearing.

Mr. Porter entered the Brooklyn Community Corrections Center ("BCCC"), the RRC designated by the Probation Department, on October 2, 2007.

On October 24, 2007, the Probation Department filed a petition charging Mr. Porter with a violation of supervised release for his failure to follow the rules of the RRC, including failure to report for sex offender treatment, using passes to leave the RRC for purposes other than those stated to obtain the pass to leave, and leaving the RRC without a pass.

On October 29, 2007, Mr. Porter was ordered temporarily detained pending a hearing on the violation proceeding.

On November 8, 2007, a violation of supervised release hearing was held before the undersigned. On November 13, 2007, the undersigned issued a Memorandum Opinion and Order, finding that Mr. Porter had violated a condition of his supervised release.

On December 12, 2007, Mr. Porter appeared before the undersigned for sentencing on the violation. At that time, the parties were informed of the Court's *sua sponte* consideration of monitoring Mr. Porter's movements while on supervised release through a Global Positioning Satellite (GPS) system and by undercover surveillance. The sentencing was adjourned to January 3, 2008, so that the parties could submit any written objections to the *sua sponte* proposed condition. In a letter dated December

27, 2007, Mr. Porter, through counsel, informed the Court that he did not object to the monitoring condition while he was in residence at the RRC.

On January 3, 2008, I sentenced Mr. Porter to 4 months imprisonment, with credit for the time that he had been in detention in connection with the violation proceeding and sentencing, as well as a new term of supervised release of 32 months. In addition to the District's standard conditions of release and the special conditions imposed at the time of the original sentence, I imposed several additional special conditions of supervised release: (1) that Mr. Porter should reside in an RRC approved by the Probation Department until he found an appropriate residence, or for a period of 180 days, whichever should come first; (2) that Mr. Porter undergo sex offender treatment approved by the Probation Department and submit to polygraph examinations in connection with that treatment; (3) that Mr. Porter be limited to possession of one personal Internet-capable device subject to the Probation Department's monitoring program, but that until Mr. Porter had access to a personal Internet capable device, he should be permitted access to the Internet at various branches of the New York Public Library and the Brooklyn Public Library; (4) that Mr. Porter be prohibited from associating with children under the age of 18, unless a responsible adult was present and he had prior

approval from the Probation Department; and (5) that Mr. Porter's movements be monitored through a GPS system and by undercover surveillance throughout his term of supervised release.

On January 8, 2008, Mr. Porter appealed the Memorandum Opinion and Order entered on January 3, 2008. The appeal was denied in a mandate dated August 29, 2008.

On February 26, 2008, Mr. Porter began his new 32-month term of supervised release.

On March 20, 2008, Mr. Porter filed a motion to modify, or stay pending appeal, the condition of his release requiring the monitoring of his movements through a GPS device. In a Memorandum Opinion and Order dated April 10, 2008, I denied this motion.

On September 10, 2008, the Probation Department charged Mr. Porter with violating the conditions of supervised release by (1) failing to participate in a sex offender treatment program, and (2) engaging in new criminal conduct. Probation Department Report of Violation of Supervised Release dated September 9, 2008 ("Charging Report").

On December 1, 2008, a violation of supervised release hearing was held before the undersigned, at which defendant and two government witnesses, Karen Long of the New York Center for Neuropsychology & Forensic Behavioral Science and Erin Weinrauch of the United States Probation Department, testified.

The government submitted evidence in the form of a discharge summary from the sex offender treatment program approved by the Probation Department, which showed that Mr. Porter was discharged from treatment because his engagement in the program was "unsatisfactory." *See* Charging Report, Ex. 1 ("Client Discharge From Treatment Summary" from the New York Center for Neuropsychology & Forensic Behavioral Science). Specifically, the summary shows that Mr. Porter minimized the severity of his offense during treatment, refused to explore his motivation for and thinking errors related to his offense, was dismissive when given feedback and often became sarcastic and defensive. The summary shows that over the course of treatment, Mr. Porter was repeatedly confronted about his failure to participate in a meaningful manner by both his therapist and his probation officer, but that Mr. Porter appeared to ignore this feedback and frequently stated that he believed he was participating appropriately just by attending the treatment sessions. The discharge summary notes that "while Mr. Porter is in need of sex offender treatment, he is treatment resistant at this time." Previous reports submitted by the Probation Department also allege that Mr. Porter has failed to complete homework assigned during treatment and has minimized the importance of such assignments.

Ms. Long, Mr. Porter's therapist at the New York Center

for Neuropsychology and Forensic Behavioral Science, testified
concerning Mr. Porter's participation in the sex offender
treatment program. Ms. Long testified that while it was common
for patients to be resistant to treatment initially, it was
uncommon for patients to remain treatment-resistant for six
months, as she concluded Mr. Porter had. Transcript of December
1, 2008 Hearing ("Tr.") at 14. In Ms. Long's opinion, Mr. Porter
failed to reach either of the two basic goals of sex offender
therapy: accepting responsibility for the offending behavior and
gaining insight and understanding into the factors that brought
about the offending behavior. *Id*. at 11. Concerning her
individual sessions with Mr. Porter, Ms. Long testified as
follows:

> Throughout individual sessions [Mr. Porter] was very
> resistant. When I would ask questions he would be
> evasive. He would often answer questions about his
> offending with, he would be distracted and start
> speaking about legal issues. He would tell me about
> some case law that made my questions somewhat
> irrelevant in his mind. He was snide, sarcastic. When
> I would ask him questions about his offending he would
> make comments such as, I told you about that already, I
> dealt with my offense, so we're back to that again.
> Overall, I think, he significantly minimized the
> severity of his offending and his responsibility in it.
> So he did not meet the basic beginning rules of
> treatment.

*Id*. at 11-12. Ms. Long also testified about Mr. Porter's
participation in group sessions, noting that he was disruptive,
made comments inquiring into other group members' legal issues,
suggested that other members should challenge their lawyers, and

generally redirected the group's conversation away from Ms. Long's questions to legal matters. *Id.* at 13. Ms. Long could not recall an instance in which Mr. Porter had been helpful during the group therapy process. *Id.* Finally, Ms. Long testified that Mr. Porter had disregarded homework assignments he was given, with the explanation that they were not important to him. *Id.* at 15.

Mr. Porter testified that he thought he had participated meaningfully in sex offender treatment with Ms. Long. Specifically, he testified that he had admitted during therapy that he might have had motivations for entering chat rooms other than "doing research." *Id.* at 37-38. He also acknowledged during therapy that viewing child pornography created a demand for it. *Id.* at 41-42.

With regard to the second charge, the government submitted evidence that Mr. Porter engaged in new criminal conduct by violating the permanent injunction directing him to refrain from contacting his former wife or their child, Andrew. The permanent injunction states that Mr. Porter shall not directly or indirectly contact his former wife in person, by mail, e-mail, fax, telephone, through another person, or in any other manner. *See* Charging Report, Ex. 2 (copy of permanent injunction). On August 22, 2008, Mr. Porter's former wife advised Probation Officer Erin Weinrauch that Mr. Porter had

called her father's residence on August 21, 2008, at approximately 8:30pm, and requested to speak with his former wife. Charging Report at 11. Thereafter, on August 28, 2008, a Port Orange, Florida police officer was dispatched to the former wife's residence to obtain an incident/investigation report concerning the violation of the permanent injunction. *See* Charging Report, Ex. 3 (copy of incident/investigation report). On September 2, 2008, Probation Officer Weinrauch spoke with the former wife's father and brother, who confirmed that Mr. Porter had called their residence twice on August 21. During the first call, Mr. Porter remained silent. However, minutes later, he called a second time, identified himself as "Tom," and requested to speak to the ex-wife. The ex-wife's brother took a picture of the caller identification display on the telephone, which showed Mr. Porter's cell phone number. *See* Charging Report, Ex. 4 (copy of photo displaying Mr. Porter's cell phone number). Probation Officer Weinrauch's testimony substantially confirmed all of the above. *See* Tr. at 28-31.

Mr. Porter testified that although he lived at the address to which the government asserted the final order of protection had been mailed, he never received a copy of the final order and was unaware of its existence until the current proceedings. *Id.* at 33-34. Mr. Porter also testified that he had called his former wife's father's house because he wanted to

re-establish a relationship with his son.  *Id.* at 34, 39.

The following additional facts drawn from the parties submissions in connection with this petition.  On December 23, 2009, I found that the government had proven, by at least a preponderance of the evidence, that Porter had violated the terms of his supervised release by failing to meaningfully participate in sex offender mental health treatment.  However, because Porter had not made *repeated* attempts to contact his ex-wife, as required for a violation of New York Penal Law 215.51(b)(iv), I found that he had not committed the crime of Criminal Contempt in the first degree by attempting to contact his ex-wife in violation of the Permanent Order of Injunction in Florida.  I sentenced defendant on January 29, 2009 to nine months incarceration, without any term of supervised release to follow.

On February 4, 2009 the defendant submitted an emergency application for bail pending appeal to the Second Circuit Court of Appeals.  Prior to oral argument on that motion, on February 20, 2009, the defendant filed an application in this court seeking bail pending appeal.  I denied that application on February 23, 2009.  Oral argument in the Second Circuit was held on February 24, 2009, and Porter's application in the Second Circuit was denied on February 27, 2009.

Petitioner filed the instant motion on May 18, 2009.  On June 9, 2009, petitioner supplemented his motion with a letter

indicating he was opposed to supervised release with residency in a halfway house. He therefore requested that, if supervised release and residency in a halfway house was a condition of the court granting the habeas petition, the court instead treat his petition solely as one for bail pending appeal. That request for bail was denied on June 15, 2009.

## DISCUSSION

Relief "is generally available under § 2255[7] only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." *Graziano v. U.S.*, 83 F.3d 587, 589 (2d Cir. 1996) (internal quotation marks and citation omitted).

Petitioner raises two constitutional claims: (1) that the court's refusal to appoint additional counsel with experience in trying cases violated petitioner's right to counsel under the

---

[7] 28 U.S.C. § 2255(a) states that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). 28 U.S.C. § 2255(b) states in relevant part that "[i]f the court finds . . . that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

Due Process Clause of the Fourteenth Amendment and 18 U.S.C. §
3006A(a)(1)(E);[8] and (2) that petitioner received ineffective
assistance of counsel at his violation hearing, in violation of
the Due Process Clause.

## I. Timeliness of Petition

28 U.S.C. § 2255(f)(1) requires § 2255 motions to be
made within a one-year period of limitation that begins from "the
date on which the judgment of conviction becomes final."  28
U.S.C. § 2255(f)(1).  "[A] judgment of conviction becomes final
for purposes of § 2255 when the Supreme Court affirms a
conviction on the merits on direct review or denies a petition
for a writ of certiorari, or when the time for filing a
certiorari petition expires."  *Burrell v. U.S.*, 467 F.3d 160, 164
(2d Cir. 2006) (internal quotation marks and citation omitted).
Petitioner here has timely appealed to the Second Circuit this
court's December 23, 2008 order that he violated the conditions

---

[8]  18 U.S.C. § 3006A(a)(1)(E) Provides in relevant part that:

Each United States district court, with the approval of the judicial
council of the circuit, shall place in operation throughout the district
a plan for furnishing representation for any person financially unable
to obtain adequate representation in accordance with this section.
Representation under each plan shall include counsel and investigative,
expert, and other services necessary for adequate representation. Each
plan shall provide the following:

1. **(1)** Representation shall be provided for any financially eligible
person who—

. . .

**(E)** is charged with a violation of supervised release or faces
modification, reduction, or enlargement of a condition, or extension or
revocation of a term of supervised release.

of his supervised release. By motion of the petitioner, that appeal is currently being held in abeyance pending the resolution of the instant habeas motion.[9] Since an appeal of petitioner's sentence is currently pending, the sentence is not yet final. It is thus clear that a year hasn't passed since the sentence became final, and petitioner's motion is not time-barred.

Moreover, the fact that an appeal is currently pending does not deprive this court of jurisdiction over defendant's motion under 28 U.S.C.A. § 2255. While a motion under 28 U.S.C.A. § 2255 motion is generally deemed premature when filed during the pendency of a direct appeal, any such limitation is prudential rather than jurisdictional. *Compare Mohammed-Blaize v. I.N.S.*, 133 Fed. Appx. 774 (2d Cir. 2005) (holding petition for postconviction relief filed prior to petitioner's direct appeal to be premature); *with United States v Busse*, 814 F. Supp. 760 (E.D. Wis. 1993) (entertaining 2255 motion despite pendency of direct appeal). The decision of whether to entertain a petition is a subject "addressed to the sound discretion of the federal trial judges," and "habeas corpus has traditionally been regarded as governed by equitable principles." *Sanders v. U.S.*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078-79 (1963). In particular, it is appropriate for a court to entertain a habeas petition where,

---

[9] The procedure of holding an appeal in abeyance pending resolution of a habeas petition has been approved by the Second Circuit. *See*, e.g., *See U.S. v. Outen*, 286 F.3d 622, 632 n.6 (2d Cir. 2002).

as here, direct review would be "incompetent to provide adequate redress." *King v. Hasty*, 154 F. Supp. 2d 396, 400 (E.D.N.Y. 2001).

Consequently, I will entertain defendant's habeas petition despite the pendency of a direct appeal because, in light of the relatively short length of the sentence, the appeal may well become moot by the time it is heard; if petitioner's nine months sentence has already been completed he would be left with no opportunity to contest that sentence's legality.

## II. Failure to Appoint Additional Counsel

Petitioner claims that the court's refusal to appoint additional counsel to assist Andrea Hirsch at the violation proceeding violated petitioner's rights under the Due Process Clause of the Fourteenth Amendment. I assume for the purposes of this petition that the petitioner in fact had a constitutional Due Process right to counsel at the violation hearing. *See Gagnon v. Scarpelli*, 411 U.S. 778, 790, 93 S.Ct. 1756, 1763 (1973) (holding right to counsel in violation hearings is determined on a case-by-case basis).

Even where an accused has a constitutional right to counsel, "an indigent defendant has no right to choose the particular counsel appointed to represent [him or] her." *Green v. Abrams*, 984 F.2d 41, 47 (2d Cir. 1993). Where an attorney has been appointed, a defendant may not demand a different attorney be

substituted "unless the defendant can demonstrate 'good cause' for the court to assign different counsel." *Ballard v. Walker*, 772 F. Supp. 1335, 1339 (E.D.N.Y. 1991). *See also U.S. v. Borbon*, No. 08-0521-cr, 2009 WL 1256903 at *1 (2d Cir. May 7, 2009)(good cause for substitution of counsel may include a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict) (citing *U.S. v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972)).

"The justification for assigning new counsel is most compelling if the defendant can demonstrate that counsel is unable to provide the defendant effective assistance, as, for example, by reason of professional incompetence or the existence of a personal impediment which handicaps his or her professional performance." *Ballard v. Walker*, 772 F. Supp. at 1339 (citations and quotation marks omitted).

Petitioner here has not demonstrated that his appointed counsel was incapable of providing him with effective representation.  His counsel, Andrea Hirsch, is an extremely well qualified attorney with twenty five years of experience, including having clerked for an appellate judge, worked at the Legal Aid Society Criminal Appeals Bureau for 11½ years, and started her own private legal practice.  Declaration of Andrea Hirsch dated May 15, 2009 ("Hirsch Decl.") at 28.  Her skillful

advocacy is also evident in her writing; including in the papers
on the present application, in which she argues that she provided
ineffective assistance to the petitioner.  While Hirsch's prior
experience has been mostly confined to appellate work, she proved
quite capable of representing his interests at a relatively brief
violation hearing where the only issues were whether petitioner
had meaningfully participated in a mental health treatment
program, and whether he had contacted his ex-wife in violation of
a court order.[10]  She has personally handled five hearings in the
past without assistance from trial-level counsel.  Hirsch Decl.
at 28.  Hirsch's request that trial-level counsel be appointed
demonstrates her role as a zealous advocate attempting to secure
the best possible representation for Mr. Porter, and does not
establish that she was incapable of herself providing effective
representation.  *See Ballard v. Walker*, 772 F. Supp. at 1339
("[A]n assigned counsel who unsuccessfully requests to be
relieved from his duty is not incapable of providing effective
legal assistance.").  While she expressed concern about her
ability, she performed well at the hearing.  Petitioner has not
demonstrated that appointment of an additional attorney with
experience trying cases would have been more effective than Ms.
Hirsh because petitioner has not identified any true deficiency

---

[10]  At the hearing, I found that the defendant had not violated any court
order by contacting his wife, and thus that conduct is of no relevance to the
instant petition.

in her performance.[11]   The applicable standard is whether Ms.

Hirsch acted as an effective advocate.   *Ballard*, 772 F. Supp. at

1339.

## III. Ineffective Assistance of Counsel

When a defendant claims ineffective assistance of counsel,

the Second Circuit uses the framework established in *Strickland*

*v. Washington,* 466 U.S. 668 (1984), to evaluate the claim.   *See,*

*e.g.*, *United States v. Hernandez,* 242 F.3d 110, 112 (2d Cir.

2001).   To establish a claim for constitutionally ineffective

counsel, petitioner must prove two elements: (1) "the attorney's

performance fell below an objective standard of reasonableness"

and (2) "the outcome of his case would have been different had

the attorney performed adequately."   *U.S. v. Perez*, 129 F.3d 255,

261 (2d Cir. 1997) (internal citation omitted).

Petitioner has a heavy burden in establishing the first

element, as "a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable

professional assistance."   *Strickland v. Washington*, 466 U.S.

668, 689 (1984).   "The proper standard for attorney performance

is that of reasonably effective assistance."   *Id.* at 687.   "The

performance inquiry is contextual."   *Purdy v. U.S.*, 208 F.3d 41,

44 (2d Cir. 2000).   "No particular set of detailed rules for

---

[11]   Petitioner identifies a number of purported deficiencies in Ms.
Hirsch's performance, which are addressed individually *infra.*

counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-689. Review of attorney conduct must not be based on hindsight. *Id.* at 689. An attorney who forgoes other potentially successful strategies is not constitutionally ineffective on that ground and a court must presume that, "under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks and citation omitted).

After establishing "cause," petitioner must then establish that he was actually prejudiced by these errors. "[E]rror by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1422 (2009) (internal quotation marks and citation omitted).

"There is no reason for a court deciding an ineffective assistance claim... to address both components of the inquiry if

the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *see also Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007), *cert. denied*, 128 S.Ct. 962 (2008). Accordingly, a court may decline to consider the prejudice prong if a defendant failed to demonstrate that counsel performed below an objective standard of reasonableness. *See U.S. v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994), *cert. denied*, 513 U.S. 911 (1994). More likely, since "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," a court may address the prejudice prong without resolving whether counsel's performance was deficient. *Strickland,* 466 U.S. at 697.

In making his ineffective assistance of counsel claim, petitioner points out five supposed deficiencies by his counsel: (1) counsel's failure to familiarize herself more fully with the literature on sex-offender treatment to determine if the defendant's program was in some way deficient; (2) failure to ask additional questions of Karen Long, the psychologist leading petitioner's therapy sessions, regarding Long's expertise, the effectiveness of the treatment, and the decision to terminate petitioner; (3) failure to seek to have a second psychologist evaluate the defendant to determine what sort of treatment would be effective; (4) failure to request all of Long's written reports or notes regarding petitioner; and (5) failure to inquire into the role that the United States Probation Department played

in the decision to terminate treatment.

With respect to the first three supposed deficiencies, each would have made no material difference to the ultimate outcome at the December 1, 2008 violation hearing for one simple reason: regardless of the program's alleged shortcomings, the defendant was still obligated to participate in a meaningful manner. Even if defense counsel had persuasively established that the treatment program was flawed, the appropriate remedy would have been for the defendant to comply to the best of his ability, and raise any objection to the program with the court at the earliest opportunity.[12] As I found in my December 23, 2008 order, Mr. Porter in fact did neither. *See U.S. v. Howard Porter*, 03-CR-0129 (CPS) (Dec. 23, 2008 Memorandum Opinion and Order). In addition, neither these first three purported deficiencies, nor the remaining asserted deficiencies, suffice to demonstrate ineffective assistance under *Strickland*.

---

[12] Petitioner argues that Porter should not be faulted for his failure to make an application to the court for a change of his therapy program because such an application was beyond his ken and because any such blame is attributable to his counsel. This argument fails for two reasons. First, there is no general right to representation to affirmatively request a modification to the conditions of supervised release. *See U.S. v. Bailey*, 343 F. Supp. 76 (D.C. Mo. 1971) (no hearing or right to counsel where modification favorable to defendant made to terms of supervised release). Consequently any error of petitioner's counsel in not making such an application could not be cause for an ineffective assistance claim. *See Coleman v. Thompson*, 501 U.S. 722, 757, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("Because [the petitioner] had no right to counsel . . . any attorney error that led to the default . . . cannot constitute cause to excuse the default."). Second, petitioner was in fact capable of communicating with this court, his probation officer, or his therapist at the New York Center for Neuropsychology and Forensic Behavioral Science as he has done numerous times in the past to communicate his dissatisfaction with the conditions of his supervised release.

*Petitioner's Complaints Regarding his Therapy Program and his Therapist, Ms. Long*

None of the supposed deficiencies in the therapy program or in the conduct of petitioner's individual therapist excuse his failure to participate meaningfully in that program. Accordingly, petitioner was not prejudiced by counsel's failure to elicit these deficiencies in the violation hearing.

Petitioner alleges that, according to the psychological literature, sex offender treatment must be individualized and openly set out specific goals and expectations which have been developed in consultation with the client. However, the testimony at petitioner's violation hearing established that treatment was individualized,[13] and that it was focused on specific goals, which were communicated to petitioner.[14] He has also not demonstrated that Ms. Long's failure to "involve the client in the process" (Def. Br. at 17) of setting treatment goals prevented his participating meaningfully in the therapy

---

[13] *See* Tr. 7:13 ("[the format is] very specific to the offending behavior."); 8:7-9 ("A lot of it is focused on the individual. The individuals talk about their own experience, and their own offense.") *See also* July 20, 2009 Declaration of Karen Long ("Long Decl.") at ¶ 8 ("The results of the [initial] interview and the clinical tests are used to determine what kind of therapy program will best suit the patient.")

[14] *See* Tr. 7:11-13 (Treatment "focus[es] on taking responsibility for their offending, what the motivation for the offense was"); 11:20-24 ("The basic goal in the beginning is to accept responsibility for offending and then to gain some sort of insight and understanding into the factors that brought that about"); 16:23-25 ("I had spoken with him on several occasions about his poor participation, about what was expected of him.").

program; the testimony suggests petitioner was unwilling to be involved in setting such goals. Tr. 12:2-15 (petitioner was evasive, uncooperative and "did not meet the basic beginning rules of treatment."). *See also* Long Decl. ¶ 10 (stating petitioner's refusal to engage in meaningful therapy sessions hindered the psychologist's ability to explore the possible motivations for his behavior).

Petitioner also criticizes counsel for failing to bring out deficiencies in the therapy program's method of coping with patients' resistance. However, that subject was addressed both in direct testimony and in counsel's cross examination of Ms. Long. Ms. Long testified that while it is common for patients to be resistant to therapy at the outset, the therapy program takes into account such resistance, and that patients typically become more cooperative over time. *See* Tr. 14:1-6, 14:17-19, 20:10-22:7. *See also* Long Decl. ¶¶ 14-15 ("During both individual and group therapy sessions, it is my practice, based on my training and supervision, to address these feelings [of shame and social stigma] by exploring with my patients various coping methods they can use to lessen the shame they feel and to deal with the stigma they experience."). The testimony and other exhibits fail to show that counsel could have elicited further information sufficient to show that flaws in the therapy program, rather than petitioner's own lack of interest, were responsible for his

failure to participate meaningfully in the program.  Although
petitioner argues that the therapy program should have begun
while petitioner was incarcerated, included a course of
psychotherapy or pre-treatment preparedness, been conducted in a
less "confrontational" therapeutic style and been run by a
therapist with additional training, he fails to demonstrate that
such additional measures were necessary to permit meaningful
participation in the program.  Notably, no other participant in
petitioner's therapy group was discharged from the program, and
of the approximately 100 patients that Ms. Long as treated at New
York Forensic, only three patients other than Porter have ever
been discharged for failing to participate.  Long Decl. ¶¶ 7, 13.

Counsel may also have had a legitimate strategic goal
in deciding not to further cross examine Ms. Long regarding
petitioner's resistance to therapy, as doing so would have
undermined a defense that petitioner *did* participate meaningfully
in the therapy program.  *See Keiser*, 56 F.3d at 18 ("actions or
omissions by counsel that might be considered sound trial
strategy do not constitute ineffective assistance")*.*

*Failure to Have a Second Psychologist Evaluate the Defendant*

Petitioner argues that his counsel erred in failing to
have a second psychologist appointed to evaluate petitioner, in
order to determine what sort of treatment would be effective.

Following the December 1, 2008 violation hearing, and prior to filing the present application, petitioner's counsel arranged for an examination by a psychiatrist, Richard Krueger.[15]  Dr. Krueger raised numerous criticisms of the New York Forensic program,[16] however, none excuse petitioner's willful lack of participation.

If the terms of petitioner's supervised release had required that he successfully *resolve* his psychological issues through therapy, then criticisms regarding the efficacy of the program would be relevant.  But the special condition imposed as part of petitioner's supervised release required only that he participate *meaningfully* in such therapy.  Accordingly, since petitioner cannot show that any of the criticisms raised by Dr. Kreuger is sufficient to demonstrate that he was prevented from meaningfully participating in the therapy program, counsel did not "f[all] below an objective standard of reasonableness" in failing to raise these purported deficiencies at the violation

---

[15] Dr. Krueger had also examined petitioner before trial.

[16] Dr. Krueger's criticisms were that: (1) no treatment diagnoses or problems were identified; (2) no treatment plan was written; (3) petitioner's resistance was never identified as a specific problem of treatment and was never specifically addressed; (4) no linkage was documented between any problems requiring treatment and the treatment modalities given; (5) petitioner wasn't referred to another treatment program when he was terminated from New York Forensic; (6) the amount of time devoted to countering petitioner's resistance was too short; (7) petitioner was never involved in establishing treatment goals or formulating a treatment plan, contrary to medical practice; (8) New York Forensic failed to develop a therapeutic alliance with petitioner; and (9) the New York Forensic program's requirement that any admission by petitioner could be communicated to the Probation Department precludes meaningful therapy.

hearing.[17]  *U.S. v. Perez*, 129 F.3d at 261.


*Failure to Request all Notes of Psychologist Long*

The fourth purported deficiency, defense counsel's failure to request all written notes and reports of psychologist Long, satisfies neither prong of the *Strickland* standard.  First, the failure to obtain all such notes was not clearly deficient. Counsel was fully capable of conducting a productive cross-examination of Ms. Long based on numerous other sources she had access to, including at least some of Ms. Long's notes, the New York Forensic discharge report, and the testimony of her client, Mr. Porter.  Second, the failure to obtain the entire set of Ms. Long's notes does not satisfy the prejudice prong of *Strickland.* Counsel is unable to point to any specific benefit that would have been provided by obtaining the remainder of Ms. Long's notes, aside from the speculation that they might have been helpful in cross-examining Long, and that they would have been valuable in consulting with another psychologist regarding any deficiencies in the treatment plan.  Further cross examination of

---

[17] Several of Dr. Krueger's criticisms are contradicted by the record. New York Forensic conducted an initial interview and a number of clinical tests to diagnose petitioner's psychological issues and develop a treatment plan to address those issues.  Long Decl. ¶ 9.  Petitioner also argues that his denying a history of alcoholism in January 2003 and admitting to such a problem in March 2004 indicates 13 months were required for alcoholism treatment, and that a similar length of time could be required for sex offender treatment as.  This assertion fails because there is no evidence that March 2004 was the first time petitioner admitted to alcoholism, and because a patient's ability to address his substance abuse does not necessarily indicate a willingness to address his sexual behavior.  Long Decl. ¶ 18.

Long could not have overcome the weight of the evidence
suggesting Mr. Porter did not meaningfully participate in an
approved therapy program, including the evasive and unpersuasive
testimony of the defendant himself.[18]  Additionally, as described
above, deficiencies in the treatment plan are entirely beside the
point.  Mr. Porter was required only to make a *bona fide* effort
to participate in treatment; he was not obligated to, nor was he
penalized for failing to, reach any objective measure of clinical
success through therapy.

*Failure to Question the Role Played by the Probation Department*
*in Petitioner's Discharge from the Therapy Program*

          Petitioner's final complaint concerns his counsel's
failure to inquire into the role the United States Probation
Department played in the decision to terminate Porter.
Specifically, petitioner asserts that defense counsel could have
called Mr. Porter's Probation Officer, Erin Weinrauch, as a
witness in order to attempt to show that the decision to
terminate Porter from New York Forensic's program was initiated
or encouraged by Probation.  However, like the failure to obtain
all of Long's notes, this decision meets neither prong of
*Strickland*.

_____

[18] Petitoner's counsel also argues that she should have questioned her
client more thoroughly, because in doing so she would have learned of the
difficulties Ms. Long experienced in leading the group.  However, the record
contains no evidence that Ms. Long experienced such difficulties in the group
aside from petitioner's own assertion.

The decision to not call Weinrauch is precisely the sort of strategic decision that courts will not second-guess in assessing an ineffective assistance of counsel claim.  *See U.S. v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.") (quoting *U.S. v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992)); *Keiser*, 56 F.3d at 18 (court will not second-guess arguably strategic decisions of counsel).  The decision thus fails to satisfy the first prong of *Strickland*; it did not fall below an "objective standard of reasonableness." *U.S. v. Perez*, 129 F.3d at 261.  The failure to call Weinrauch also fails to meet the prejudice prong of Strickland.  *Strickland*, 466 U.S. at 694.  Not only is there no evidence suggesting Probation would desire to, or in fact did, try to have Porter terminated from the therapy program, even assuming arguendo that Probation influenced New York Forensic's decision to terminate Porter, it would not have altered my finding that Porter in fact failed to meaningfully participate in the therapy program.  The ultimate cause of Porter's violation of the conditions of his supervised release was his failure to meaningfully participate in the New York Forensic program, not

the program's decision to terminate him.[19]  Accordingly, even if

petitioner could have established that Probation influenced the

decision to terminate him from the program, it would not have

changed this court's finding that he had violated the conditions

of his supervised release.  *See* Dec. 23, 2008 order at 20

(finding Porter willfully refrained from meaningful

participation).


**IV. Request For A Stay Pending Appeal**

Defendant requests that this court stay his sentence

pending appeal, on the ground that whether this court erred in

denying his request to have trial-level counsel represent him at

the violation hearing constitutes a "substantial question" on

appeal.

After a defendant has been sentenced and convicted of a

crime, the standard governing the defendant's release or

detention pending appeal is set forth in 18 U.S.C. § 3143,[20]

---

[19] Accordingly, petitioner's allegation that the therapy program failed to have multiple clinicians involved in the decision to dismiss him is not relevant.  It is his behavior over the entire course of therapy, rather than New York Forensic's final decision to dismiss him from the program, that I found violated the conditions of his supervised release.  In addition, the evidence in the record does not establish whether or not the decision to terminate petitioner was made by a single clinician.  *See* Long Decl. ¶ 6.

[20] § 3143 provides, in relevant part:

[T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds-
     (A) by clear and convincing evidence that the person is not likely
     to flee or pose a danger to the safety of any other person or the

which "reverse[s] the presumption in favor of bail [pending appeal]." United States v. Miller, 753 F2d 19, 22 (3d Cir. 1985); *See also United States v. Randall*, 761 F.2d 122, 124-25 (2d Cir. 1985). The defendant will not be released unless he can show both that there is a substantial question of law likely to result in reversal AND that he "is not likely to flee or pose a danger to the safety of any other person or the community if released." 18 U.S.C. § 3143(b)(1)(A). The Defendant has not made any such showing here that he is not likely to pose a danger to the safety of others. Rather, he has demonstrated a disturbing pattern of deliberate non-compliance with the conditions of release imposed on him by this court, and continues to lack any insight into his offending behavior. Since he has not shown that he is unlikely to pose a danger to the safety of others, I need not address whether the appeal raises a substantial question of law or fact likely to result in reversal. However, I find that petitioner's appeal would in any case not in fact raise any substantial question of law or fact which is likely to result in reversal. Petitioner raises facially meritless claims of

---

community if released under section 3142(b) or (c) of this title; and
(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--
(i) reversal,
(ii) an order for a new trial,
(iii) a sentence that does not include a term of imprisonment, or
(iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

ineffective assistance of counsel that are premised on the
allegation that New York Forensic was a flawed therapy program.
As described above, allegations regarding the effectiveness and
methodological validity of the treatment program have no bearing
on whether in fact Mr. Porter meaningfully participated in that
program, and are thus irrelevant to whether his counsel was
effective in representing him at the violation hearing.
Petitioners claims are thus not likely to lead to reversal of
this court's order.

**CONCLUSION**

For the reasons set forth above, both petitioner's
request to vacate his conviction pursuant to 28 U.S.C. § 2255,
and his request for a stay of his sentence pending appeal, are
denied.  Petitioner is denied a certificate of appealability
because petitioner has not made a substantial showing of the
denial of a constitutional right.  *See Reyes v. Keane*, 90 F.3d
676, 680 (2d Cir. 1996).  The clerk is directed to transmit a
copy of the within to all parties.


SO ORDERED.

Dated:    Brooklyn, New York
          August 27, 2009


                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge